**In the Matter of: CONDEMNATION BY THE MUNICIPALITY OF PENN HILLS of Allegheny County of Certain 3.5 Acres Land Located in the Township of Wilkins, Allegheny County, Pennsylvania Being Copy of:**

**Joseph and Enrichetta D'Andrea: their heirs, executors, administrators, successors, assigns or any other person found to have an interest in the property**

**Appeal of: Joseph and Enrichetta: D'Andrea.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 2005.
Decided March 11, 2005.

See also 738 A.2d 534.

William C. Kenny, Pittsburgh, for Joseph and Enrichetta D'Andrea.

William P. Bresnahan, II, Pittsburgh, for the Municipality of Penn Hills.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Joseph and Enrichetta D'Andrea (Property Owners) appeal from the order of the Court of Common Pleas of Allegheny County, sustaining the Preliminary Objections filed by the Municipality of Penn Hills (Penn Hills) to their Amended Petition for Appointment of a Board of Viewers. Property Owners seek damages from Penn Hills as compensation for the period of time during which Penn Hills had prevailed in the trial court, which had enjoined Property Owners from developing their property without Penn Hills' approval. On appeal, Property Owners argue that they have alleged sufficient facts to establish a de facto taking of their property under the test set forth in *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

Property Owners own five acres of land (Property) which is partially located in Penn Hills and partially located in the Township of Wilkins (Wilkins).[1] The portion of the Property located in Penn Hills is zoned R–1–A residential and the portion of the Property located in Wilkins is zoned C commercial. Property Owners wished to build a commercial office structure on the Property and, in 1995, requested that Penn Hills rezone the Penn Hills portion of the Property to permit their construc-

---

**1.** A Registered Surveyor hired by Property Owners found 3.48 acres or 69.6% of the Property was in Wilkins and 1.52 acres or 30.4% of the Property was in Penn Hills. (R.R. 14a.)

tion plans. Penn Hills denied their request for rezoning and, thus, began years of litigation involving multiple actions and multiple parties.

Property Owners appealed Penn Hills' denial to the trial court. In the meantime, several adjacent property owners filed their own petition with the trial court requesting the appointment of a commission to establish the boundary line between Penn Hills and Wilkins for the Property.[2] On June 5, 1995, the trial court ordered the appointment of a boundary dispute commission (commission), subject to the adjacent property owners' posting of a bond to cover commission expenses.[3] However, because the adjacent property owners failed to post the bond, the commission was not formed at that time.[4] Nonetheless, approximately two years later, in August, 1997, Penn Hills joined the litigation and guaranteed its assets as security in lieu of the required bond. The trial court was then able to appoint the commission members (two registered professional engineers and an attorney).[5] The commission submitted its final report to the trial court in May 1998, and the trial court confirmed that report "absolutely"

by order dated September 2, 1998. The commission determined, *inter alia,* that the portion of land Property Owners wished to develop was wholly within Wilkins.[6] Penn Hills appealed, and this Court affirmed the trial court's decision by opinion and order dated July 14, 1999.[7] Penn Hills, again, appealed, but the Pennsylvania Supreme Court denied allocatur on May 25, 2000.[8] Consequently, *the boundary between Penn Hills and Wilkins was conclusively established as of May 25, 2000.*

While the boundary dispute litigation was ongoing in 1997, Property Owners decided to relocate their proposed building site within the Property so that the building would be situated entirely within Wilkins. They then applied to Wilkins for land development approval for their building. Meanwhile, Penn Hills passed a resolution authorizing its municipal solicitor to initiate legal action to prevent Wilkins' final approval of Property Owners' plan. However, on November 10, 1997, Wilkins granted Property Owners final land development approval and issued them a building permit. In December, Property Own-

---

**2.** Allegheny County Court of Common Pleas Docket No. GD–95–007661 (Boundary Dispute).

**3.** Section 302 of The First Class Township Code, Act of June 24, 1931, P.L. 1206, *as amended,* (Code), 53 P.S. § 55302, allows the creation of a commission when at least 50 residents of a township sign a petition requesting same. The commission is to "ascertain and establish disputed lines and boundaries between two or more townships or between townships and cities or boroughs" and requires the posting of a bond to secure payment of all costs of the proceeding. *Id.*

**4.** In that same order, the trial court denied a motion for a stay of the proceedings filed by the Township of Wilkins.

**5.** *See* Tr. Ct. Memorandum Op. dated September 2, 1998. (R.R. 27a–31a.) Section 303 of the Code provides that the court "appoint three impartial citizens [to the commission], one of whom shall be a registered surveyor or engineer...." 53 P.S. § 5503.

**6.** *See* Memorandum Opinion, February 25, 1999, 268 C.D.1998 (*noting that the trial court order of June 22, 1998 confirmed the report of the commission indicating that the land sought to be developed was located in Wilkins and not in Penn Hills*). Exceptions were filed to this order; the trial court confirmed the report absolutely by order dated September 2, 1998.

**7.** *Municipality of Penn Hills v. Swatchik,* 738 A.2d 534 (Pa.Cmwlth.1999).

**8.** 563 Pa. 653, 758 A.2d 1204 (2000).

ers began site preparation. Penn Hills then filed a complaint in equity and a motion seeking a preliminary injunction.[9] The trial court granted a preliminary injunction by order dated December 20, 1997, to prevent Property Owners from performing any further work on the Property. At the hearing, Property Owners, who were granted intervenor status, requested that a bond be set to cover the damages they sustained or would sustain. Thereafter, the trial court entered an order on December 29, 1997, requiring the parties to comply with the following until the boundary dispute was fully resolved:

* * *

4. Building or any activity in relation to the real property on the disputed boundary is subject to the jurisdiction of *both* the Municipality of Penn Hills *and* the Township of Wilkins pending further order of Court;

5. Owners of property on the disputed boundary shall not hereafter proceed with building or other activity in relation to their property without first obtaining approval from *both* the Municipality of Penn Hills and the Township of Wilkins until further order of this Court.

(Tr. Ct.Order, 12/29/97) (emphasis added).

Property Owners appealed the trial court's order granting the preliminary injunction to this Court. The report of the commission had already been confirmed when we issued a memorandum opinion and order in that appeal, and we, therefore, dissolved the preliminary injunction stating:

[T]he preliminary injunction is no longer extant or is subject to dissolution because the trial court confirmed the report of the boundary dispute commission indicating that *the land sought to be developed was located in Wilkins* and not in Penn Hills. Because the request and grant of the preliminary injunction was based on the ongoing boundary dispute, the parties agree that once the trial court issued a final order resolving that dispute, the basis for the grant of the preliminary injunction no longer exists. While Penn Hills has appealed the trial court's boundary dispute order to this Court, it agrees that unless that order of the trial court is reversed, Property Owners now only need the approval of Wilkins to undertake their proposed development. Accordingly, we will issue an appropriate order dissolving the preliminary injunction.

*Municipality of Penn Hills v. Township of Wilkins,* No. 268 C.D.1998, slip op. at 3–4 (Pa.Cmwlth., Filed February 25, 1999) (footnote omitted and emphasis added).[10] After this order, the preliminary injunction no longer prevented Property Owners' development of the Property.

On April 16, 2002, Property Owners filed a petition for appointment of a board of view to determine damages for the time period they were enjoined from using their Property; this petition initiated the case currently on appeal to this Court.[11] They filed an amended petition on June 6, 2002, to which Penn Hills filed preliminary objections.[12] After a hearing on April 13,

---

9. Allegheny County Court of Common Pleas Docket No. GD–97–020738 (Preliminary Injunction).

10. As previously noted, this Court *affirmed* the trial court's order concerning the parties' boundary dispute on July 14, 1999, and the Pennsylvania Supreme Court denied allocatur on May 25, 2000.

11. Allegheny County Court of Common Pleas Docket No. GD–02–007512 (Takings Dispute).

12. On October 10, 2002, the trial court stayed proceedings in GD–02–007512 (Takings Dispute) pending this Court's decision in 434 C.D.2002, in which Property Owners had appealed the trial court's denial of a petition for

2004, the trial court entered an order dated August 24, 2004 sustaining Penn Hills' preliminary objections. The court found that Property Owners failed to allege and prove facts sufficient to sustain a de facto taking. Property Owners now appeal to this Court.

 Our review of a trial court's ruling on preliminary objections to a petition for appointment of a board of viewers is limited to determining whether an error of law was committed or whether necessary findings of fact are supported by substantial evidence. *Shaner v. Perry Township*, 775 A.2d 887 (Pa.Cmwlth.2001), *petition for allowance of appeal denied*, 567 Pa. 769, 790 A.2d 1021 (2001). The trial court is responsible for resolving evidentiary conflicts and, when its factual findings are supported by substantial evidence, they will not be disturbed on appeal. *Nolen v. Newtown Township*, 854 A.2d 705, 708 n. 5 (Pa.Cmwlth.2004).

 On page 3 of their brief, Property Owners frame the issue in this appeal as follows:

> Did Appellants allege sufficient facts to prove that there was a *de facto* taking of their property in Wilkins Township under the test set forth in *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn Central*

*Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) and *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

A de facto taking occurs when an entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property. *Miller and Son Paving, Inc. v. Plumstead Township*, 552 Pa. 652, 717 A.2d 483 (1998), *cert. denied*, 525 U.S. 1121, 119 S.Ct. 903, 142 L.Ed.2d 902 (1999). Pennsylvania law holds that a landowner alleging a de facto taking is under a heavy burden to establish that such a taking has occurred. *Id.*

When considering takings issues, the Pennsylvania Supreme Court has consistently relied upon the decisions of the U.S. Supreme Court. *Machipongo Land and Coal Co., Inc. v. Dep't. of Envtl. Protection*, 569 Pa. 3, 24 n. 7, 799 A.2d 751, 763 n. 7 (2002), *cert. denied*, 537 U.S. 1002, 123 S.Ct. 486, 154 L.Ed.2d 397 (2002). *See also United Artists' Theater Circuit, Inc. v. City of Philadelphia*, 535 Pa. 370, 635 A.2d 612 (1993) (holding that, with regard to a landmark designation, the takings clause in the Pennsylvania Constitution does not provide more extensive protections than does the U.S. Constitution).

damages at Nos. GD–97–020738 (Preliminary Injunction) and 95–GD–007661 (Boundary Dispute). They were seeking in excess of $1,000,000 for the three-year delay in the development, beneficial use and enjoyment of their Property, which they alleged was caused by Penn Hills' involvement, and resulted in a de facto taking. Property Owners also filed, at the same common pleas docket numbers, a motion for a rule to show cause why damages should not be assessed against Penn Hills, in which they argued, *inter alia*, that Penn Hills wrongfully invoked equity jurisdiction and wrongfully obtained a preliminary injunction. By order dated January 16, 2002, the trial court denied Property Owners' motion for a

rule to show cause because there had never been a determination that the injunction was improvidently granted so as to allow Property Owners to seek damages on that basis. The trial court determined that this was an original action which required a factual determination made by a jury and not by petition and rule auxiliary to the boundary dispute resolution proceedings; it denied the motion without prejudice to the Property Owners to seek damages by any other appropriate process. Property Owners appealed to this Court.

In our decision at 434 C.D.2002, filed February 26, 2003, we affirmed the orders of the trial court at Nos. GD–95–007661 and GD–97–020738.

Because Property Owners' argument relies on the holdings in three U.S. Supreme Court cases, we now turn to a discussion of this precedent.

■ The general rule is "that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). This determination is a question of degree, and cannot be disposed of by general propositions. *Id.* at 416, 43 S.Ct. 158. Rather, determining what is "too far" depends on the particular facts and circumstances of each case. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646.

The first case cited by Property Owners in support of their argument that a taking has occurred is *Agins,* where the appellants acquired five acres of unimproved land in the city of Tiburon, California to use for residential development. Shortly thereafter, a state law was passed requiring that the city prepare a general plan governing land use and the development of open spaces. The zoning ordinances adopted by the city in compliance with this law placed appellants' property in an area zoned for residential planned development and open spaces. This zoning category allowed the appellants to build between one and five single-family residences on their property. Without seeking approval for development of their tract under the ordinances, the appellants brought suit alleging, *inter alia,* that the city had taken their property without just compensation.

In *Agins,* the U.S. Supreme Court stated that application of a general zoning law to a particular property constitutes a taking "if the ordinance does not substantially advance legitimate state interests, or denies an owner economically viable use of his land." *Id.* at 260, 100 S.Ct. 2138 (citations omitted). The Court explained that

in a taking, "the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Id.*

In applying the law to the facts of the case, the Supreme Court held that the city's enactment of the zoning ordinances did not constitute a taking of the appellants' property. It found that exercises of the city's police power in passing and enforcing the zoning ordinances substantially advanced the legitimate government goal of protecting city residents from the "ill effects of urbanization." *Id.* at 261, 100 S.Ct. 2138. Recognizing that the ordinances could limit development, the Court noted that "they neither prevent the best use of appellants' land, nor extinguish a fundamental attribute of ownership." *Id.* at 262, 100 S.Ct. 2138 (citations omitted). It specifically noted that the appellants were free to submit a development plan to local officials, and could be permitted to build as many as five houses on their property. *Id.* In addition, the Court found that the city's zoning ordinances benefited both the appellants and the public by assuring the "careful and orderly development of residential property with provision for open-space areas," and that the appellants would share the burdens of the city's exercise of its police power with other owners. *Id.*

The second case cited by Property Owners in support of their argument, *Penn Central,* is the oldest of the three and was decided by the U.S. Supreme Court in 1978. In *Penn Central,* New York City applied its Landmarks Preservation Law (Law) to designate the Grand Central Terminal (Terminal) as a landmark, and the block it occupied as a landmark site. The purpose of such designation was to protect the building and the surrounding area from decisions that could destroy or fundamentally alter their character. Appellant,

Penn Central, owner of the Terminal, entered into a lease agreement with appellant UGP Properties to construct a multistory office building *over* the Terminal. New York City's Landmark Preservation Commission rejected the appellants' plan as destructive of the Terminal's historic and aesthetic features. The appellants then brought suit in state court claiming, *inter alia,* that application of the Law to the property effected a taking without just compensation.

The U.S. Supreme Court identified several factors that it found significant in determining whether a taking has occurred. The Court recognized, as factors, "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" and "the character of the governmental action." *Id.* at 124, 98 S.Ct. 2646. The Court explained:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights *in the parcel as a whole* . . . .

*Id.* at 130, 98 S.Ct. 2646 (emphasis added). Applying this "test" to the facts of the case, the Court determined that the Law did not interfere with Penn Central's primary expectation concerning the use of its parcel. The Court noted that "[the Terminal's] designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal containing *office* space and concessions." *Id.* at 136, 98 S.Ct. 2646. Further, the Law permits

Penn Central to profit from the Terminal and to obtain a "reasonable return" on its investment. *Id.* Concerning the character of the action, the Court found that the Law applied to a vast number of structures in New York City in addition to the Terminal, and that the preservation of landmarks benefits all New York citizens both economically and by improving the quality of life in New York City. *Id.* at 134, 98 S.Ct. 2646. Furthermore, focusing on the parcel as a whole, the Court determined that "[t]his is no more an appropriation of property by government for its own uses than is a zoning law prohibiting, for 'aesthetic' reasons, two or more adult theatres within a specified area, or a safety regulation prohibiting excavations below a certain level." *Id.* at 135, 98 S.Ct. 2646 (citations omitted). The Court noted that the Commission had not prohibited *any* construction above the Terminal. *Id.* at 137, 98 S.Ct. 2646. Further, Penn Central could transfer their "air rights" to other parcels in the vicinity of the Terminal. *Id.* Consequently, the Court found the restrictions imposed on the Terminal to be substantially related to the promotion of the general welfare in New York City, and concluded that no taking had occurred.

The final case cited by Property Owners to support their position in this appeal is *Tahoe–Sierra.* There, the Tahoe Regional Planning Agency (TRPA) imposed two moratoria (totaling 32 months) on development in the Lake Tahoe Basin while it was formulating a comprehensive land-use plan for the area. Certain real estate owners affected by the moratoria, and an association representing them, filed suit claiming that TRPA's actions constituted a taking of their property without just compensation. The petitioners sought application of the categorical rule articulated in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (holding that compensation is re-

quired when a regulation deprives an owner of "*all* economically beneficial uses" of his land) to determine whether there had been a taking. In order to bring their case under the rule announced in *Lucas,* petitioners claimed the Court could "effectively sever a 32–month segment from the remainder of each landowner's fee simple estate, and then ask whether that segment has been taken in its entirety by the moratoria" *Id.* at 331, 122 S.Ct. 1465. The U.S. Supreme Court granted certiorari to address this question: "whether a moratorium on development imposed during the process of devising a comprehensive land-use plan constitutes a per se taking of property requiring compensation under the Takings Clause of the United States Constitution." *Id.* at 306, 122 S.Ct. 1465.

The Court in *Tahoe–Sierra* noted that petitioners' argument ignored *Penn Central's* admonition that, in regulatory takings cases, the Court must focus on "the parcel as a whole." *Tahoe–Sierra,* 535 U.S. at 331, 122 S.Ct. 1465 (quoting *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646.) It explained:

> The starting point for the court's analysis should have been to ask whether there was a total taking of the entire parcel: if not, then *Penn Central* was the proper framework.... [A] permanent deprivation of the owner's use of the entire area is a taking of "the parcel as a whole," whereas a temporary restriction that merely causes a diminution in value is not. Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted. Cf. *Agins v. City of Tiburon,* 447 U.S. at 263, n. 9, 100 S.Ct. 2138 ("Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their proper-

ty when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' " (quoting *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939))).

*Id.* at 331–332, 122 S.Ct. 1465. The Court, in deciding whether "fairness and justice" are better served by a categorical rule or a *Penn Central* inquiry, held that "the extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained." *Id.* at 334, 122 S.Ct. 1465. It then cited to Justice Holmes' "warning" in *Pennsylvania Coal Co.:*

> "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." 260 U.S. at 413, 43 S.Ct. 158. A rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking. Such an important change in the law should be the product of legislative rulemaking rather than adjudication.

*Id.* at 335, 122 S.Ct. 1465. The Court noted a better approach to a temporary regulatory taking claim requires careful examination and weighing of *all* the evidence. *Id.* The Court concluded that fairness and justice would be best served by relying on the rule in *Penn Central* when deciding cases like this, and found that no taking had occurred.

We now must apply the rules in the cases cited by Property Owners to the facts of this case to determine whether the government went "too far" when the trial

court enjoined Property Owners, upon petition of Penn Hills, from the use and enjoyment of their Property.[13] The starting point for this Court's analysis requires us to ask whether there has been a total taking of Property Owners' entire parcel. *Tahoe–Sierra*, 535 U.S. at 332, 122 S.Ct. 1465. If there has been a total taking, our decision is controlled by the holding in *Lucas;* however, if there has not been a total taking, we utilize the analysis articulated in *Penn Central* to make our decision. A taking of "the parcel as a whole" requires *"permanent deprivation of the owner's use of the entire area." Tahoe–Sierra*, 535 U.S. at 332, 122 S.Ct. 1465 (emphasis added). A temporary restriction on an owner's use of his property is, therefore, *not a total taking. Id.* Here, Property Owners argue that they were restricted from using their Property for a temporary period of time. Therefore, pursuant to the rule articulated in *Tahoe–Sierra*, we are to apply the factors described in the *Penn Central* case to the facts before us to determine if there has been a taking. In *Penn Central*, "[i]n deciding whether a particular governmental action has effected a taking, [the Supreme] Court focuses ... both on the character of the action and on the nature

and extent of the interference with rights in the parcel as a whole...." *Penn Central*, 438 U.S. at 130, 98 S.Ct. 2646. The *Agins* case further qualifies the rule; it states:

> The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, or denies an owner economically viable use of his land. The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken, the question necessarily requires a weighing of private and public interests.

*Id.*, 447 U.S. at 260–61, 100 S.Ct. 2138 (citations omitted). With these rules in mind, we now evaluate Property Owners' specific contentions.

Property Owners first claim that Penn Hills' actions went "too far" and deprived them of the beneficial and economically viable use of their property. They contend that during the border dispute (which lasted approximately 29 months),[14] "the

13. In its brief, Penn Hills states: "[i]t is Appellants' contention that the Resolution passed by Penn Hills is a governmental regulation which substantially deprived [them] of the beneficial use of [their] property and amounted to a temporary de facto taking." (Br. at 10.) As previously discussed, Penn Hills passed a *resolution* authorizing legal action be taken to prevent Wilkins' final approval of Property Owners' plan. Penn Hills raises an interesting question as to whether a resolution authorizing legal action constitutes a "government regulation" sufficient to effectuate a taking. A resolution has been defined as "something less formal than 'ordinance'; generally, it is mere expression of opinion or mind of council concerning some matter of administration, within its official cognizance, and provides for disposition of particular item

of administrative business of a municipality; it is not a law...." *Plum Borough School District v. Schlegel*, 855 A.2d 939, 941 n. 6 (Pa.Cmwlth.2004) (quoting Black's Law Dictionary 1311 (6th ed.1990)). Penn Hills' resolution authorized legal action; the trial court in Allegheny County imposed and enforced the injunction preventing Property Owners' from proceeding with their construction plans. It is unclear as to whether Penn Hills' resolution in this case would be a "governmental regulation." It does not appear that this issue was raised before the trial court. Further, because of our disposition, we need not discuss it further.

14. Property Owners have not provided the specific length of time they allege they were unable to use their Property. The injunction

property at issue was not usable for any gainful purpose." (Br. at 10.) They state that the Property could not have been zoned properly for any purpose in Penn Hills, and it was not economically feasible to act within the Wilkins' portion because of the injunction enjoining development on the Property.

■ We disagree that Penn Hills' actions deprived Property Owners of economically viable use of their land. As we stated in *Nolen:*

> A taking does not result merely because a regulation deprives an owner of the most profitable use of his or her property; otherwise, almost all zoning restrictions could be categorized as takings in the sense that the owner is not completely free to use his or her property as desired.... Moreover, a moratorium on development ... does not constitute a *per se* taking of property requiring compensation; [a] moratorium is one of many factors to be considered.

*Id.,* 854 A.2d at 708 (citing *Machipongo* and *Tahoe–Sierra*). While it was true that they were temporarily deprived of their most profitable (or desired) use—erection of a commercial office building—Property Owners were free to develop the Property in other ways, consistent with the zoning ordinances applicable to the Property. The trial court's order of December 29, 1997 did not totally forbid construction on the Property; rather, it required that Property Owners obtain the approval of both municipalities in which the Property was located, *Penn Hills* and *Wilkins, before proceeding* with building or other activity. Penn Hills' expert, Dennis Cestra,

a state certified general appraiser and Vice President of Operations with Howard Hanna Real Estate Services, testified at the Condemnation hearing, on April 13, 2004, that he found four uses for Property Owners' land that are legally and physically feasible in *both* Penn Hills and Wilkins—a funeral home, a private school, a recreational facility (including swim clubs and tennis courts), and a senior citizen/group care facility. (Tr. at 40.) In addition, there was no mortgage on the Property, the taxes were timely paid and Property Owners were free to sell or develop the Property when the proceedings ended. (Tr. Ct. Op. at 3.) As stated in *Tahoe–Sierra,* "a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." *Id.,* 535 U.S. at 332, 122 S.Ct. 1465. Penn Hills' actions did not interfere with Property Owners' long-term expectations for the Property, nor did such actions prevent Property Owners from gaining a reasonable return on their investment upon this Court's dismissal of the preliminary injunction. The fact that Property Owners may have encountered "fluctuations in value during the process of governmental decisionmaking," is merely an "incident of ownership," and not a taking in the constitutional sense. *Agins,* 447 U.S. at 263 n. 9, 100 S.Ct. 2138.

■ Property Owners also believe that Penn Hills went "too far" and forced them to "bear public burdens which in all fairness and justice should be borne by the public as a whole." (Br. at 8) (citing *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (quot-

---

was put in place in the end of December 1997, and dissolved in the end of February 1999—a total of 14 months. The border dispute essentially continued while Penn Hills sought allocatur with the Pennsylvania Supreme Court. Allocatur was denied in May of

2000. This could potentially add another 15 months. *See also* Commonwealth Court's Memorandum Opinion dated February 26, 2003, 434 C.D.2002, p. 3 (stating that Property Owners sought damages for a *three-year delay*).

ing *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960))). We disagree. Penn Hills' action benefited both private and public interests by ensuring the recording and marking of accurate borders for the municipality. The enforcement of zoning ordinances benefits Property Owners, as well as the public, by serving the municipality's interest "in assuring the careful and orderly development" of residential and commercial properties. *See Agins,* 447 U.S. at 262, 100 S.Ct. 2138. Any landowner with property involved in the border dispute would have shared the burden of being unable to engage in any type of building or construction until such dispute was resolved.

Property Owners further contend that Penn Hills' involvement went "too far" and did not amount to a legitimate state interest because only a small portion of their land, a little over one acre, was in Penn Hills proper. Again, we disagree. The size of the parcel is immaterial to the issue at bar; the injunction requested by Penn Hills substantially advanced a legitimate state interest by maintaining the status quo until the Property dispute was settled. *See Tahoe–Sierra,* 535 U.S. at 337–38, 122 S.Ct. 1465 (noting that "moratoria ... are used widely among land-use planners to preserve the status quo while formulating a more permanent development strategy"). Further, the injunction protected the general welfare of the citizens of both Penn Hills and Wilkins by properly enforcing zoning regulations, and preventing commercial development along a disputed boundary between property zoned for commercial and residential uses. This case falls within the concern expressed by Justice Holmes that, if every delay in the use of property resulting from government processes required payment, government "hardly could go on." Where, as here, there is a legitimate boundary dispute involving property with different zoning clas-

sifications, a judicial order entering a preliminary injunction to preserve the status quo is not a compensable taking.

Accordingly, because Property Owners have failed to meet their burden of proof that they suffered a compensable taking, we affirm the order of the trial court.

## *ORDER*

**NOW,** March 11, 2005, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby affirmed.