2005 ND 193

**WILD RICE RIVER ESTATES, INC.,**
Plaintiff and Appellant

v.

**CITY OF FARGO, a municipal
corporation, Defendant
and Appellee.**

No. 20050074.

Supreme Court of North Dakota.

Nov. 14, 2005.

Rehearing Denied Dec. 23, 2005.

Jonathan T. Garaas, Garaas Law Firm, Fargo, ND, for plaintiff and appellant.

Patricia A. Roscoe (argued) and Garylle B. Stewart (appeared), Solberg, Stewart, Miller & Tjon, Fargo, ND, for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Wild Rice River Estates, Inc. ("Wild Rice"), appealed from a judgment dismissing its inverse condemnation action against the city of Fargo and from an order denying its post-trial motions. We conclude the trial court correctly ruled that Fargo's 21–month moratorium on building permits did not constitute a taking of Wild Rice's property in violation of the federal and state constitutions, and we affirm.

I

[¶ 2] Wild Rice is the owner and developer of a rural residential subdivision along the banks of the Wild Rice River located about three miles south of Fargo. Wild Rice was owned by Anton Rutten, who acquired the farmland in 1947. Rutten anticipated that the property would one day become a part of Fargo, and he hoped to develop a subdivision on the property when the city grew. The subdivision was platted in 1993 with 38 lots, and 16 of those lots are located on an oxbow of the river. Wild Rice was incorporated in 1994 for the purpose of developing the subdivision. Because of county and township regulations, Wild Rice was required to construct at its expense a connection to the local sanitary sewer system operated by Southeast Cass Water Resource District. Fargo and Wild Rice entered into a 10–year agreement for the city to treat the sewage collected from the development, and Wild Rice installed sewer and water services for 14 of the lots. At the time of the platting, the required flood elevation

for lots in Wild Rice was one foot above base floor elevation. Wild Rice sold the first lot in the development in 1994 for $24,000 and Rutten purchased a lot in 1996 or 1997. In the meantime, Wild Rice invested approximately $500,000 to develop and promote the subdivision.

[¶ 3] The Red River Valley, including the Wild Rice River, has a long and significant history of flooding. A bridge that once connected a road to the oxbow of the Wild Rice River where lots are currently located was removed in 1989 because of flood damage. During the April 1997 flood, all undeveloped lots in Wild Rice were under water. The homes then existing at the subdivision were not under water, but the partially constructed Rutten home was damaged by water and "muck."

[¶ 4] After the 1997 flood, Fargo began working with the Federal Emergency Management Agency ("FEMA") to plan for future floods, and on August 1, 1997, Fargo brought the Wild Rice subdivision into its extraterritorial jurisdiction. On June 15, 1998, FEMA developed a preliminary flood insurance rate-map for the area and several Wild Rice lots were located within the preliminary floodway. The Wild Rice River did not have a mapped floodway before this time, and city officials believed the FEMA designation for the river would be formalized in about 18 months. On August 10, 1998, the Fargo City Commission decided that a "moratorium be placed on the issuance of all building permits for new construction in the floodway within the City of Fargo and its four-mile extraterritorial zone effective August 10, 1998 for a period until the Fargo City Ordinances have been passed and FEMA has made a final determination on their flood plain map." Although several of Wild Rice's lots were affected by the moratorium, others were not affected. During the approximately 21–month period the moratorium was in effect, Fargo city officials participated in many meetings with local, state and federal officials concerning flood plan mitigation issues.

[¶ 5] In May 1999, Anton Rutten's daughter, Bonnie Rutten, applied for a building permit to construct a home on one of the lots in Wild Rice, but the permit was denied because the lot was located within the area identified by FEMA in the preliminary designated floodway covered by the moratorium. During the moratorium, some buyers showed interest in purchasing Wild Rice lots and several people contacted Wild Rice for information. One potential buyer signed two purchase agreements and another signed a lot-hold agreement, but no lots were sold. Wild Rice repeatedly attempted to persuade Fargo to lift the moratorium and issue permits for construction, but the city refused.

[¶ 6] Wild Rice brought this inverse condemnation and tortious interference action on March 30, 2000, and Fargo filed its answer on April 21, 2000. On April 27, 2000, the Fargo city engineer wrote to the city commissioners and recommended that the building permit moratorium be lifted and the city adopt FEMA's June 15, 1998 preliminary flood insurance rate-map panel as the governing panel for all flood-prone areas. Following a public hearing, the city commission voted to lift the moratorium on May 1, 2000.

[¶ 7] After the moratorium was lifted, Wild Rice sold five lots. The party who signed a purchase agreement during the moratorium purchased a lot in May 2000 for $32,900. Lots were also purchased in March 2002 for $39,000, in November 2002 for $39,000, in July 2003 for $55,900, and in April 2004 for $59,900. Other sales were pending at the time of these proceedings.

[¶ 8] Following a bench trial, the trial court ruled in favor of Fargo, concluding there had been no "taking" of Wild Rice's property and no malicious interference

with third-party contract rights. The court also denied Wild Rice's post-trial motions.

## II

[¶ 9] Wild Rice does not challenge the trial court's dismissal of its claim for malicious interference with third-party contract rights, but asserts the court erred in dismissing its claim for inverse condemnation because Fargo's 21–month moratorium constituted a "taking" of its property.

[¶ 10] Whether there has been a taking of private property for public use is a question of law which is fully reviewable on appeal, *Braunagel v. City of Devils Lake*, 2001 ND 118, ¶ 16, 629 N.W.2d 567, but we will not set aside a trial court's findings of fact on a takings claim unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *Minch v. City of Fargo*, 332 N.W.2d 71, 73 (N.D.1983). A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court is left with a definite and firm conviction a mistake has been made. *Buri v. Ramsey*, 2005 ND 65, ¶ 13, 693 N.W.2d 619.

[¶ 11] Because Wild Rice challenges the moratorium as a taking of its property under both the federal and state constitutions, it is appropriate to outline takings jurisprudence under the respective constitutional provisions.

## A

[¶ 12] The Fifth Amendment to the United States Constitution guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The takings clause of the Fifth Amendment is made applicable to the states through the Fourteenth Amendment. *See Rippley v. City of Lincoln*, 330 N.W.2d 505, 507 n. 1 (N.D.1983).

[¶ 13] In *Lingle v. Chevron U.S.A. Inc.*, —— U.S. ——, ——, 125 S.Ct.

2074, 2082, 161 L.Ed.2d 876 (2005), the United States Supreme Court recently disavowed the "stand-alone" regulatory takings test announced in *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), that " '[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests.' " In doing so, the Court summarized the remaining valid rules that govern its takings clause jurisprudence. The Court identified two categories of regulatory action that generally will be deemed per se takings: "First, where government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Id.* at 2081. Compensation is required for physical takings, "however minimal the economic costs [they] entail[ ]," because they "eviscerate[ ] the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Id.* at 2082. "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* at 2081 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). The complete elimination of a property's value is the determinative factor in this category because the total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation. *Lingle*, 125 S.Ct. at 2082. "Outside these two relatively narrow categories," regulatory taking challenges are governed by the standards set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *Lingle*, 125 S.Ct. at 2081. These standards are "designed to allow 'careful examination and weighing of all the relevant circumstances.' " *Tahoe–Sierra Preserva-*

*tion Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 636, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J. concurring)). The primary *Penn Central* factors are " '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations,' " and the " 'character of the governmental action'— for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.' " *Lingle*, 125 S.Ct. at 2081–82 (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646). The *"Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 125 S.Ct. at 2082.

[¶ 14] The United States Supreme Court has addressed whether a moratorium on land development imposed during a government agency's process of devising a comprehensive land-use plan constitutes a per se taking of property requiring compensation under the takings clause of the Fifth Amendment. The Court's decision in *Tahoe–Sierra*, 535 U.S. 302, 306, 122 S.Ct. 1465, 152 L.Ed.2d 517, involved two moratoria that prohibited virtually all development on property for a 32–month period in an effort to maintain the status quo while the government agency studied the impact of development on Lake Tahoe and designed a strategy for environmentally sound growth. The Court rejected the argument that a temporary deprivation of all economically viable use compels a finding that a categorical taking has occurred under *Lucas*. The court explained:

An interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest. See Restatement of Property §§ 7–9 (1936). Both dimensions must be considered if the interest is to be viewed in its entirety. Hence, a permanent deprivation of the owner's use of the entire area is a taking of "the parcel as a whole," whereas a temporary restriction that merely causes a diminution in value is not. Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted. Cf. *Agins v. City of Tiburon*, 447 U.S., at 263, n. 9, 100 S.Ct. 2138 ("Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense' " (quoting *Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939))).

*Id.* at 331–32, 122 S.Ct. 1465.

[¶ 15] The Supreme Court in *Tahoe–Sierra* also rejected a proposed per se rule that any moratorium lasting more than one year is constitutionally unacceptable. The Court acknowledged "[i]t may well be true that any moratorium that lasts for more than one year should be viewed with special skepticism" and "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim," but concluded "the interest in 'fairness and justice' will be best served by relying on the familiar *Penn Central* approach when deciding cases like this, rather than by attempting

to craft a new categorical rule." *Tahoe–Sierra,* 535 U.S. at 341–42, 122 S.Ct. 1465.

### B

■ [¶ 16] Under N.D. Const. art. I, § 16, "[p]rivate property shall not be taken or damaged for public use without just compensation." This Court has said our state constitutional provision is broader in some respects than its federal counterpart because the state provision " 'was intended to secure to owners, not only the possession of property, but also those rights which render possession valuable.' " *Grand Forks–Traill Water Users, Inc. v. Hjelle,* 413 N.W.2d 344, 346 (N.D.1987) (quoting *Donaldson v. City of Bismarck,* 71 N.D. 592, 3 N.W.2d 808 Syll. ¶ 1 (1942)). Nevertheless, this Court has looked to both state and federal precedents in construing takings claims under the state constitution, *see, e.g., Southeast Cass Water Res. Dist. v. Burlington N. R.R. Co.,* 527 N.W.2d 884, 890 (N.D.1995), and our cases on inverse condemnation under the state constitution bear some similarities to the federal analysis.

■ [¶ 17] In *Braunagel,* 2001 ND 118, ¶ 16, 629 N.W.2d 567, this Court summarized its jurisprudence on regulatory takings:

> [T]he City, acting through its police powers, has broad authority to enact land-use regulations without compensating the landowner for the restrictions placed upon use of the property. *Grand Forks–Traill Water Users, Inc. v. Hjelle,* 413 N.W.2d 344, 346 (N.D.1987); *Rippley v. City of Lincoln,* 330 N.W.2d 505, 507 (N.D.1983); *Kraft v. Malone,* 313 N.W.2d 758, 761 (N.D.1981), *overruled on other grounds by Shark v. Thompson,* 373 N.W.2d 859 (N.D.1985); *Eck v. City of Bismarck,* 283 N.W.2d 193, 197 (N.D.1979). A zoning ordinance does not constitute a taking of property for public use merely because it diminishes the value of the regulated property or disallows the best and highest use of the property. *Grand Forks–Traill,* at 346; *Rippley,* at 507; *Eck,* at 197. Governmental regulation constitutes a taking for public use only when it deprives the owner of all or substantially all reasonable uses of the property. *Grand Forks–Traill,* at 346; *Rippley,* at 507; *Kraft,* at 761.

This Court has also adopted the parcel-as-a-whole rule, relying upon *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (quoting *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646), for the proposition that "[i]n determining whether a restriction constitutes a taking, courts look to the effect of the restriction on the parcel of land as a whole, rather than to the effect on individual interests in the land." *Hjelle,* 413 N.W.2d at 346. The Supreme Court stated in *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, that it, "quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government." We have also observed that "[c]lear guidelines are similarly absent from the variety of precedents pronounced by this court." *Minch v. City of Fargo,* 332 N.W.2d 71, 73 (N.D.1983).

### C

■ [¶ 18] Wild Rice argues the 21–month moratorium constituted a per se categorical taking of its property because the moratorium denied it all economically viable use of the property. Wild Rice relies on the Supreme Court's statement in *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886 (footnote omitted), that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to

leave his property economically idle, he has suffered a taking."

[¶ 19] The Supreme Court's decision in *Tahoe–Sierra* disposes of Wild Rice's claim that *Lucas* controls this case. *Lucas* involved a permanent, rather than a temporary taking. The Court stated the *Lucas* "holding that the permanent 'obliteration of the value' of a fee simple estate constitutes a categorical taking does not answer the question whether a regulation prohibiting any economic use of land for a 32–month period has the same legal effect." *Tahoe–Sierra,* 535 U.S. at 330–31, 122 S.Ct. 1465. The Court said "the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value; the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry." *Id.* at 332, 122 S.Ct. 1465.

[¶ 20] We conclude that the moratorium did not constitute a per se categorical taking of Wild Rice's property under the federal and state constitutions.

D

▇▇ [¶ 21] Wild Rice argues the moratorium constituted a taking under the Supreme Court's *Penn Central* analysis. Under *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, the particularly significant factors a court must consider are: 1) the "economic impact of the regulation on the claimant"; 2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and 3) "the character of the governmental action."

[¶ 22] Wild Rice contends the evidence supports a conclusion that a taking has occurred. There was evidence of economic impact on the claimant, according to Wild Rice, because of the nearly $500,000 it invested in the property between 1992 and 1999, most of which was mandated by gov-ernmental entities that required a public sewer system and road infrastructure for the development. Wild Rice also relies on the pending sales of lots that did not take place because potential purchasers were unable to obtain building permits. Wild Rice argues the moratorium interfered with its investment-backed expectations because of its inability to sell residential lots after investing $500,000 in the property. Wild Rice argues the governmental action in this case is characterized by bad faith, because the city conducted no reviews or studies to create new ordinances applicable to its property during the moratorium period and lifted the moratorium only after impacted landowners brought inverse condemnation actions. Wild Rice claims the moratorium was used by the city simply "to prevent construction on Wild Rice's previously platted real property during an unsuccessful attempt to secure Federal funding to purchase Wild Rice's real property at a lower price (a price without need for compensation for new construction)."

[¶ 23] However, in concluding Wild Rice had not established a taking under the *Penn Central* factors, the trial court reasoned:

12. [Wild Rice] retained economically viable use of its property during the moratorium. *Cf. Palazzolo v. Rhode Island,* 533 U.S. 606, 632, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (holding that reduction in developer's property from $3,150,000 to $200,000, due to a state coastal committee's refusal to allow development in costal area, did not amount to a deprivation of all economic value and therefore did not amount to a total takings claim).

13. There is a huge disconnect between the fact of the history of [Wild Rice] development and its claim for compensation. Pre-moratorium sales were

at the rate of ½ lot per year (the average lots sales for 1994 until July 1998). Rounding up 21 to 24 months, the loss was one (1) lost/delayed lot sale. At trial, loss on one of the riverside lots would be approximately $30,000 according to the Wild Rice River Estates brokers. A mere delay equals the sum of delayed investment opportunity ("interest") would be more in the nature of $3,000, a far cry from the one million dollars plus claimed by [Wild Rice]. Furthermore, "[m]ere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are incidents of ownership. They cannot be considered a taking in the constitutional sense." *Tahoe–Sierra*, 535 U.S. at 332, 122 S.Ct. 1465.

. . . .

15. The moratorium did not single out Plaintiff's property. Rather, it applied to other developments as well and the City has not paid compensation to other developers similarly affected. *Cf. Tahoe–Sierra*, 535 U.S. at 340, 122 S.Ct. 1465 (stating that the need to protect planners' decisional process is stronger when developing a regional plan as opposed to considering a permit for a single parcel).

16. The moratorium was not an appropriation of [Wild Rice's] property for public use, but rather a temporary moratorium until local, State and Federal officials could adequately review a flood plain management for the area so devastated by the 1997 flood.

. . . .

18. Fargo city officials acted in good faith and with proper diligence concerning the moratorium as part of an overall effort to maintain the status quo until flood planning efforts and development could be re-evaluated after the devastating 1997 flood.

19. Fargo city officials were justified in waiting for FEMA's final adoption of a floodway for the Wild Rice River and other rivers in the Red River Valley.

20. The moratorium protected prospective buyers who might build on a river lot, not knowing, for example, that a home previously located on or next to the lot was damaged or destroyed by the 1997 flood.

21. Given the devastation and cost in damages caused by the flood, the City's moratorium was a reasonable, appropriate land-use regulation, issued in an effort to maintain the status quo of development in flood-prone areas until Fargo city officials and local, state and federal agencies had an opportunity to properly review and prepare an appropriate flood management plan for flood-prone areas within the City of Fargo's extraterritorial jurisdiction.

22. The City's moratorium bears a reasonable relationship to a legitimate governmental purpose; it is not arbitrary or capricious and does not amount to an unconstitutional taking of property requiring payment of just compensation.

[¶ 24] The trial court's factual findings are supported by the record. Although Wild Rice had originally projected sales of four lots per year, Wild Rice had difficulty selling any lots from the very beginning of its existence. Only one lot was sold to an outside party between 1994 and 1998 before the moratorium became effective, notwithstanding the assistance of a realtor experienced in river developments and a two-year tax exemption offer. Lots in Wild Rice were prone to flooding and all but two of the Wild Rice lots were covered by water during the 1997 flood. Additional flooding occurred in 2001. After the moratorium was lifted, prospective buyers expressed concerns about water and flood issues. As the trial court found, "[m]any

factors" besides the moratorium "affected [Wild Rice's] investment over the years." The evidence suggests Wild Rice's investment-backed expectations were unreasonable.

[¶ 25] Moreover, courts have said the focus of the economic impact criterion is the change in fair market value of the subject property caused by the regulatory imposition measured by comparing the market value of the property immediately before the governmental action with the market value of the same property immediately after the action is terminated. *See, e.g., Cane Tennessee, Inc. v. United States,* 57 Fed.Cl. 115, 123 (Fed.Cl.2003); *Leon County v. Gluesenkamp;* 873 So.2d 460, 467 (Fla.App.2004). Here, Wild Rice sold more lots at higher prices after the moratorium was lifted than it did before the moratorium became effective. The most recent lot sale reflected in the record was for $59,900, more than double the $24,000 Wild Rice received for a lot in 1994. Under these circumstances, it is far less likely that a compensable taking has occurred. *See Leon County,* 873 So.2d at 467 (no taking where landowners sold property for $500,000 profit after court-ordered moratorium on development was dissolved); *Condemnation By The Municipality of Penn Hills,* 870 A.2d 400, 409 (Pa.Cmwlth.2005) (no taking where 29–month injunction to suspend property development did not prevent landowners from gaining a reasonable return on their investment after injunction was dismissed).

[¶ 26] An extraordinary delay in governmental decisionmaking coupled with bad faith on the part of the governmental body may result in a compensable taking of property. *See Bass Enter. Prod. Co. v. United States,* 381 F.3d 1360, 1366 (Fed.Cir.2004); *Wyatt v. United States,* 271 F.3d 1090, 1098 (Fed.Cir.2001); *Appolo Fuels, Inc. v. United States,* 54 Fed.Cl. 717, 737 (Fed.Cl.2002); *Byrd v. City of*

*Hartsville,* 365 S.C. 650, 620 S.E.2d 76, 2005 WL 2291782, *5 (2005). Fargo claimed it issued the moratorium in an effort to maintain the status quo until the city, along with other governmental bodies, could determine whether it was safe to build in flood prone areas. The moratorium applied to all land located within the preliminary designated floodway, not only to property owned by Wild Rice. According to Fargo, the city believed it was appropriate to wait for FEMA's final adoption of a floodway before building should continue. Although Wild Rice argues the city was simply keeping the value of its property deflated while waiting to secure federal funding to purchase the property, the trial court found that "city officials acted in good faith and with proper diligence concerning the moratorium." We apply the clearly erroneous standard to trial court determinations of good or bad faith. *See, e.g., Belfield Educ. Ass'n v. Belfield Pub. Sch. Dist.,* 496 N.W.2d 12, 14 (N.D.1993); *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Ins. Co.,* 279 N.W.2d 638, 644 (N.D.1979). In light of the evidence, the trial court's finding that the city acted in good faith is not clearly erroneous nor can we say the 21–month length of the moratorium was extraordinary under these circumstances.

[¶ 27] Wild Rice has failed to establish that the city's temporary moratorium resulted in an unconstitutional taking of Wild Rice's property under the *Penn Central* analysis. Wild Rice has not advanced a principled theory for modifying the *Penn Central* analysis for state constitutional purposes. We conclude no unconstitutional taking of Wild Rice's property has occurred under the federal and state constitutions.

E

[¶ 28] Wild Rice argues it is entitled to be compensated for Fargo's temporary

taking of its property under principles announced by this Court in *Rippley*, 330 N.W.2d 505.

[¶ 29] *Rippley*, 330 N.W.2d at 506, involved a Lincoln city zoning ordinance that zoned for public use 20 acres of the Rippleys' property which previously had been zoned residential. The city intended to use the land in the future for construction of a school and other governmental operations, and after the city failed to commence eminent domain proceedings or otherwise offer to compensate the Rippleys for their land, they brought an inverse condemnation action. *Id.* The trial court dismissed the claim, concluding the city's action did not constitute a taking entitling the Rippleys to compensation. *Id.*

[¶ 30] On appeal, this Court reversed, holding that by zoning the Rippleys' property for public use "Lincoln has deprived the Rippleys of all reasonable use of their property and has thereby accomplished a taking of the property for which just compensation is constitutionally required." *Rippley*, 330 N.W.2d at 509. The Court then turned to the issue of the proper remedy for the city's taking of the Rippleys' property through promulgation of the zoning ordinance and adopted Justice Brennan's view in *San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 653, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) (footnotes omitted), that " 'once a court establishes that there was a regulatory "taking," the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the "taking," and ending on the date the government entity chooses to rescind or otherwise amend the regulation.' " *Rippley*, 330 N.W.2d at 510. We concluded:

If a landowner proves that governmental regulation has deprived him of all reasonable use of his property, he is en-

titled to receive just compensation. However, the landowner cannot force a permanent taking upon the governmental body if the taking is reversible and the government wants to halt the taking. Rather, under its police power authority, the governmental body can choose to rescind the ordinance or other regulation in which case it must compensate the landowner only for a temporary taking measured by the time period between the date the regulation took effect and the date it was rescinded. If, however, the governmental body chooses to retain the ordinance or other regulation the landowner is then entitled to compensation for a permanent taking of his property. Upon remand of this case for a determination of the damage issue, the City of Lincoln must inform the court of its intention to either rescind or to continue the "P Public Use" zoning upon the Rippley property. With that information, the court can hold further hearings to determine the appropriate measure of damages in accordance with the approach advanced by Justice Brennan in *San Diego, supra,* which we adopt in this case.

*Rippley*, 330 N.W.2d at 511 (footnote omitted).

[¶ 31] Wild Rice argues it should have been allowed to assert a permanent taking of property by Fargo, because the city "did not properly plead 'abandonment of moratorium' as required by" this Court's decision in *Rippley*. Because Fargo's answer was filed before the city lifted the moratorium, the city did not allege that the moratorium had been terminated, and did not subsequently move to amend its answer to allege this fact. However, *Rippley* does not address pleading requirements for an inverse condemnation action. The city alleged in its answer that the moratorium on the issuance of building permits was "temporary," and all parties

were obviously aware that the moratorium had been terminated long before the trial began. Wild Rice's argument that the actual termination of the moratorium should be ignored under these circumstances is without merit.

[¶ 32] Wild Rice also asserts *Rippley* requires that, as a matter of law, Fargo pay it just compensation for the interim period between the enactment of the moratorium and the date the moratorium was lifted. But, the zoning ordinance in *Rippley* was essentially permanent in nature, rather than temporary. This Court said "Lincoln's zoning ordinance . . . destroys all reasonable use of the Rippleys' property leaving the Rippleys at the mercy of Lincoln as to a future date, if ever, that the latter may be willing to purchase the property for construction of public facilities." *Rippley* 330 N.W.2d at 508 (footnote omitted). Moreover, in *Rippley* the city had accomplished a taking of the property. As a consequence, this Court held that once a taking of property has been established, the landowner cannot force upon the governmental body the remedy for a permanent taking of property if it should choose to halt the taking. *Id.* at 511. Under *Rippley,* the governmental body is given an opportunity to lessen the amount of compensation it must pay to the landowner by rescinding or correcting the regulation that caused the taking. Justice Brennan's proposed rule articulated in his dissent in *San Diego,* upon which this Court relied upon in *Rippley* and which the United States Supreme Court eventually endorsed in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), only "addressed the separate remedial question of how compensation is measured once a regulatory taking is established." *Tahoe–Sierra,* 535 U.S. at 328, 122 S.Ct. 1465. The Supreme Court in *Tahoe–Sierra,* 535 U.S. at 328, 122 S.Ct. 1465, specifically

pointed out that *First English* did not address "the quite different and logically prior question whether the temporary regulation at issue had in fact constituted a taking."

[¶ 33] In this case, we have concluded the city's 21–month moratorium on issuing building permits did not constitute a taking of Wild Rice's property. The choice of remedies for an established taking of property provided in *Rippley,* 330 N.W.2d at 511, does not come into play under these circumstances. *Rippley* does not support Wild Rice's argument that a taking of its property has occurred under the state constitution.

### III

[¶ 34] Wild Rice argues the trial court erred in "prematurely" adopting Fargo's proposed findings, conclusions and order "without notice to Wild Rice" and in allowing the city to include in those findings and conclusions "facts and case law not originally determined by the trial court." Wild Rice's complaints about the "prematurely" adopted findings and conclusions were raised in its post-trial motions and were considered by the court when it denied those motions. Therefore, Wild Rice can show no prejudice resulted from the court's failure to allow Wild Rice a timely objection under N.D.R.Ct. 7.1(b). Moreover, "[w]hen the court affixes its signature to the findings, even though drafted by counsel, they become the findings of the court, and if they adequately explain the basis of the court's decision it will be upheld." *Schmidkunz v. Schmidkunz,* 529 N.W.2d 857, 858 (N.D.1995). Wild Rice's arguments are without merit.

### IV

[¶ 35] We conclude Fargo's 21–month moratorium on building permits did not constitute a taking of Wild Rice's property under the federal and state constitutions.

We have considered Wild Rice's other arguments and deem them to be either without merit or unnecessary to resolve in view of our disposition of this case. The judgment and the order denying Wild Rice's post-trial motions are affirmed.

[¶ 36] DALE V. SANDSTROM, CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., and DONOVAN JOHN FOUGHTY, D.J., concur.

[¶ 37] The Honorable DONOVAN JOHN FOUGHTY, D.J., sitting in place of CROTHERS, J., disqualified.