# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2022 ND 183

William S. Wilkinson; Ann L. Nevins and
Amy L. Perkins as Personal Representatives
for the Estate of Dorothy A. Wilkinson;
Barbara Caryl Materne, Trustee of the
Petty Living Trust; Charlie R. Blaine and
Vanessa E. Blaine, as Co-Trustees of the
Charlie R. Blaine and Vanessa E. Blaine
Revocable Trust; Lois Jean Patch, life tenant;
and Lana J. Sundahl, Linda Joy Weigel,
Deborah J. Goetz, Marva J. Will, Ronald J.
Patch, Michael Larry Patch, and Jon Charles
Patch, Remaindermen,                                    Plaintiffs and Appellants

    v.

The Board of University and School Lands
of the State of North Dakota, Brigham Oil &
Gas, LLP; Statoil Oil & Gas LP;                         Defendants and Appellees

    and

EOG Resources, Inc.; XTO Energy Inc.;
Petrogulf Corporation, and all other persons
unknown who have or claim an interest in
the property described in the Complaint,                Defendants

    and

North Dakota State Engineer,                            Intervenor and Appellee

## No. 20220037

Appeal from the District Court of Williams County, Northwest Judicial
District, the Honorable Paul W. Jacobson, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice, in which Chief Justice Jensen and Justice McEvers joined. Justice Crothers filed a specially concurring opinion.

Joshua A. Swanson (argued) and Robert B. Stock (appeared), Fargo, N.D., for plaintiffs and appellants.

Jennifer L. Verleger, Assistant Attorney General, Bismarck, N.D., for defendant and appellee The Board of University and School Lands of the State of North Dakota, and for intervenor and appellee North Dakota State Engineer.

John E. Ward, Bismarck, N.D., for defendants and appellees Brigham Oil and Gas, LLP, and Statoil Oil & Gas LP.

## Wilkinson v. Bd. of University and School Lands of the State of N.D.
## No. 20220037

**Tufte, Justice.**

[¶1] The plaintiffs appeal from a judgment dismissing their takings, conversion, unjust enrichment, civil conspiracy, and 42 U.S.C. § 1983 claims against the Board of University and School Lands ("Land Board"), Department of Water Resources,[1] and Statoil Oil & Gas LP.[2] We affirm, concluding the district court did not err in dismissing these claims and denying damages, costs, and attorney's fees.

I

[¶2] J.T. Wilkinson and Evelyn M. Wilkinson acquired title to property located in Williams County described as:

> Township 153 North, Range 102 West
> Section 12: SW¼
> Section 12: S½NW¼, excepting that portion which constitutes the right-of-way of the BNSF Railway Company
> Section 13: Farm Unit No. 312 in the Buford-Trenton Project

In 1958, the Wilkinsons conveyed the property to the United States for construction and operation of the Garrison Dam and Reservoir, but they reserved the oil, gas, and other minerals in and under the property. The plaintiffs are the Wilkinsons' successors in interest.

[¶3] The plaintiffs have leased their minerals numerous times since they conveyed the surface property to the United States. Most notably, in 2009, the

---

[1] At the time of the lawsuit, the Department of Water Resources was known as the Office of the State Engineer. The 67th Legislative Assembly repealed the statutes creating the Office of the State Engineer and State Engineer, as codified regulatory entities, and replaced those statutory entities with the Department of Water Resources and Director, respectively, effective August 1, 2021. 2021 N.D. Sess. Laws ch. 488. For the purposes of this opinion, we will refer to this party as the Department of Water Resources. N.D.R.Civ.P. 25(d).

[2] When this case began, this defendant was known as Brigham Oil & Gas, L.P. Brigham subsequently became Statoil Oil & Gas LP, which subsequently became Equinor Energy LP. This party will be referred to as Statoil.

plaintiffs (or their predecessors in interest) entered into oil and gas leases for 286 acres of their property. The plaintiffs received bonus payments of $300 per acre and a 3/16ths royalty rate. The leases provide they shall remain in effect as long as oil or gas is produced or drilling operations are continuously prosecuted, but drilling or production on pooled portions of the leases will not maintain the leases for the unpooled portions.

[¶4]   In 2010 and 2011, the Land Board entered into four oil and gas leases with oil operators in Williams County, Township 153 North, Range 102 West, for the northwest and southwest quarters of Section 12 ("Section 12 leases") and northeast and northwest quarters of Section 13 ("Section 13 leases"). Statoil is the operator of the Lippert 1-12 1-H Well, which was spud in Section 1, Township 153 North, Range 102 West. The spacing unit[3] for the Lippert Well consists of Sections 1 and 12. In November 2010, the Lippert Well began production. From August 2011 to April 2015, Statoil paid the Land Board royalties for its fractional portion of the leased acreage within the spacing unit.[4] Section 13 has no associated spacing unit, and because no drilling operations or production commenced in Section 13, the Section 13 leases expired under their terms. The Land Board received and retained bonus payments from the oil operators under the Section 13 leases.[5] The plaintiffs' 2009 leases, likewise, remain in effect for Section 12, but have expired as to Section 13.

---

[3] Under N.D.C.C. § 38-08-07(1), the North Dakota Industrial Commission establishes spacing units for a pool to prevent waste, avoid the drilling of unnecessary wells, and protect correlative rights. A "pool" is "an underground reservoir containing a common accumulation of oil or gas or both; each zone of a structure which is completely separated from any other zone in the same structure is a pool." N.D.C.C. § 38-08-02(13).

[4] In addition to the Section 12: NW1/4 and SW1/4 leases pertinent here, the Land Board has three leases covering Section 1: SE1/4 and Section 12: NE1/4 and SE1/4. Thus, the Land Board claims ownership to additional royalty interests within the Lippert Well spacing unit beyond the Section 12 leases.

[5] The Land Board also received bonus payments from the oil operator under the Section 12 leases. However, as part of the acreage adjustment process under N.D.C.C. § 61-33.1-04(2)(a) and the terms of the leases, the Land Board refunded these amounts to the oil operator. The plaintiffs have not sought disgorgement of these amounts, and thus they are irrelevant to this appeal.

2

[¶5]   In 2012, the plaintiffs sued the Land Board and oil operators to quiet title to disputed mineral interests in Sections 12 and 13. The plaintiffs amended their complaint, adding additional oil operators as defendants and the following claims: unconstitutional takings under the federal and state constitutions by the Land Board; deprivation of their constitutional rights under 42 U.S.C. § 1983 by the Land Board; and conversion, unjust enrichment, and civil conspiracy by the Land Board and oil operators, including Statoil. The district court granted the Department of Water Resources' motion to intervene as a defendant. As a result of the title dispute over minerals within the spacing unit, Statoil suspended royalty payments to the plaintiffs. Statoil also began escrowing the Land Board's royalty payments at the Bank of North Dakota (the "Bank") starting in May 2015.

[¶6]   The Land Board and Department of Water Resources (collectively, "State") moved for summary judgment. The district court granted the State's motion, concluding the State owned the disputed minerals. After the court entered summary judgment and the plaintiffs appealed, the Legislative Assembly enacted N.D.C.C. ch. 61-33.1, relating to the ownership of mineral rights of land inundated by the Pick-Sloan Missouri Basin Project dams. 2017 N.D. Sess. Laws ch. 426. In *Wilkinson v. Board of University & School Lands*, 2017 ND 231, 903 N.W.2d 51 ("*Wilkinson I*"), we reversed the judgment and remanded for the court to determine whether N.D.C.C. ch. 61-33.1, governing state ownership of the Missouri riverbed, applied and governs ownership of the minerals in this case.

[¶7]   On remand, the district court granted the plaintiffs' motion for summary judgment, concluding N.D.C.C. ch. 61-33.1 applied and the plaintiffs own the disputed minerals. In *Wilkinson v. Board of University & School Lands*, 2020 ND 179, ¶¶ 16, 20, 947 N.W.2d 910 ("*Wilkinson II*"), although a final judgment disposing of all the claims against all the parties was not entered, we exercised our supervisory jurisdiction. We affirmed the judgment in part, concluding N.D.C.C. ch. 61-33.1 applied and the disputed mineral interests are above the ordinary high water mark of the historical Missouri riverbed channel and are not state sovereign lands. *Id.* at ¶ 32. We reversed in part, concluding the

3

statutory process was not completed, and remanded to resolve the remaining claims and determine damages. *Id.*

[¶8]   Following *Wilkinson II*, the escrowed royalties were released to Statoil. In November 2020, Statoil paid the plaintiffs the outstanding royalties owed to them, dating back to November 2010, totaling $571,094. After a bench trial, the district court dismissed the plaintiffs' remaining claims and denied damages on those claims, including interest on the royalties, disgorgement of the Section 13 bonus payments made to the State, and costs and attorney's fees. The plaintiffs appeal.

## II

[¶9]   In an appeal from a bench trial, the court's findings of fact are reviewed under the clearly erroneous standard of review, and its conclusions of law are fully reviewable. *Serv. Oil, Inc. v. Gjestvang*, 2015 ND 77, ¶ 12, 861 N.W.2d 490. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. *Id.* The trial court is "the determiner of credibility issues and we do not second-guess the trial court on its credibility determinations." *Id.* "A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court." *Id.* at ¶ 13. The court's findings are adequate if the record enables us to understand its factual determinations and the basis for its conclusions of law and judgment. *Id.*

## III

[¶10] The plaintiffs argue the district court erred by dismissing their conversion claim against the State. The State asserts the district court lacked subject matter jurisdiction over the claim under N.D.C.C. § 32-12.2-04(1), which requires a claim against the State for an injury be presented to the director of the office of management and budget ("OMB") within 180 days after the alleged injury is discovered or reasonably should have been discovered. "Absent the timely filing of a notice of claim under N.D.C.C. § 32-12.2-04(1),

the court lacks subject matter jurisdiction to entertain the lawsuit." *Ghorbanni v. N.D. Council on Arts*, 2002 ND 22, ¶ 8, 639 N.W.2d 507. We review challenges to the district court's subject matter jurisdiction de novo when jurisdictional facts are not in dispute. *State ex rel. Stenehjem v. Maras*, 2021 ND 68, ¶ 8, 958 N.W.2d 475.

[¶11] It is undisputed the plaintiffs failed to present a notice of claim to OMB. They argue, however, that the State waived this argument because the judgment and order for judgment do not address this issue and the State did not appeal from the court's November 2015 order holding the statute did not apply to the conversion claim. Although the court dismissed the conversion claim on the merits, not for failure to file a notice of claim, the plaintiffs' waiver argument is unpersuasive. The November 2015 order denied the Land Board's motion to dismiss. Thus, the order was not an appealable order. *Dimond v. State ex rel. State Bd. of Higher Educ.*, 1999 ND 228, ¶ 12, 603 N.W.2d 66 (concluding that denial of a motion to dismiss is a non-appealable, interlocutory order). Further, because the issue implicates the court's subject matter jurisdiction, *Ghorbanni*, 2002 ND 22, ¶ 8, the issue cannot be waived and may be raised at any time. N.D.R.Civ.P. 12(h)(3); *Earnest v. Garcia*, 1999 ND 196, ¶ 7, 601 N.W.2d 260 (concluding that issues involving subject matter jurisdiction cannot be waived and can be raised at any time).

[¶12] The plaintiffs argue in the alternative that they were not required to present their conversion claim to OMB because the claim was not one for "injury" under the statute. "'Injury' means personal injury, death, or property damage." N.D.C.C. § 32-12.2-01(2). "Personal injury" includes "injury to a person's rights." N.D.C.C. § 32-12.2-01(4). "'Property damage' includes injury to or destruction of tangible or intangible property." N.D.C.C. § 32-12.2-01(5). The plaintiffs assert the State wrongfully exercised control over the property, but such control does not constitute property damage under the statute.

[¶13] The case law generally shows that "injury" is synonymous with tort. *See, e.g., Ghorbanni*, 2002 ND 22, ¶ 15 (concluding retaliatory discharge claim "sounded in tort" and thus notice-of-claim statute applied); *State v. Haskell*, 2001 ND 14, ¶ 7, 621 N.W.2d 358 (explaining that in *Dimond* the Court held

that "any possible tort claim [the plaintiff] may have had was barred for failing to present notice of his tort claim within the time allowed by N.D.C.C. § 32-12.2-04(1)"). "Conversion consists of a tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." *Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc.*, 2004 ND 117, ¶ 11, 680 N.W.2d 634. "Conversion requires an intent to exercise control or interfere with the use of property to such a degree as to require a forced sale of the plaintiff's interest in the goods to the defendant." *Id.* We conclude that conversion requires an injury either to personal property or the property owner's rights, consistent with N.D.C.C. § 32-12.2-01(2), (4), (5), and the plaintiffs were required to provide a notice of claim to OMB. Because a notice of claim was not provided, the district court lacked subject matter jurisdiction over the conversion claim, and dismissal of the claim, albeit for the wrong reason, was properly granted by the court. *See Schmidt v. City of Minot*, 2016 ND 175, ¶ 21, 883 N.W.2d 909 (affirming judgment of dismissal when district court reached the right result for a wrong reason).

IV

[¶14] The plaintiffs argue the State and Statoil conspired to convert their royalties. Civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damages." *Burris Carpet Plus, Inc. v. Burris*, 2010 ND 118, ¶ 42, 785 N.W.2d 164. The underlying act itself must generally be actionable as a tort claim to support a civil conspiracy claim, and if the underlying tort claim is dismissed, the civil conspiracy claim is defeated. *Id.* at ¶ 45.

[¶15] The district court concluded that the plaintiffs' conspiracy claim against the State failed for lack of an underlying tort. Indeed, the plaintiffs alleged that the State conspired to wrongfully take their property without just compensation. A taking, however, is not a tort claim. *Minch v. City of Fargo*, 297 N.W.2d 785, 789 (N.D. 1980) (A takings claim "proceeds from a

constitutional right and must be distinguished from claims grounded in tort theory only."). Moreover, even if the plaintiffs alleged the State conspired to convert their royalties, their failure to file a notice of claim with OMB bars this tort claim against the State under N.D.C.C. § 32-12.2-04(1).

[¶16] The district court also dismissed the claim against Statoil, concluding the evidence does not show the State and Statoil conspired to convert the plaintiffs' royalties in Section 12. The plaintiffs argue Statoil knew the plaintiffs owned the minerals when it entered into the Section 12 leases with the State. However, the State entered into the Section 12 leases with Bowie Oil Partners, LLC, not Statoil. Statoil came into possession of the Section 12 leases through assignment. The plaintiffs do not assert that Bowie conspired with Statoil and the State, nor do they assert Bowie was an agent of Statoil. Thus, the leases do not support the claim of a conspiracy involving Statoil.

[¶17] The plaintiffs also contend that the escrow agreement between the State and Statoil to escrow royalties at the Bank was an agreement to deprive the plaintiffs of their royalties. The district court found the escrow agreement was required under N.D. Admin. Code § 85-06-01-09, which at the time of the escrow agreement in 2015 was Land Board Rule 85-06-06-08.1 (2010). Land Board Rule 85-06-06-08.1 stated that any payor that "proposes to withhold royalty payments based upon an ownership dispute must establish an escrow deposit account and must deposit the disputed payments into this account." We agree with the court that Statoil lawfully escrowed royalties in this case. Because the State and Statoil did not act in concert to commit an unlawful act, a lawful act by unlawful means, or agree to inflict a wrong against or injury upon the plaintiffs, we conclude the court did not err by dismissing the conspiracy claim against Statoil.

V

[¶18] The plaintiffs argue the State committed an unconstitutional taking of their minerals and they are entitled to just compensation including interest. The plaintiffs do not differentiate the Takings Clause in the U.S. Constitution from the state constitutional provision, analyzing these claims together. Because no party asserts the text or history of the state constitutional

7

provision requires us to apply a different standard, we analyze the federal and state takings challenges together. *Northwest Landowners Ass'n v. State*, 2022 ND 150, ¶ 23.

[¶19] The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. "The takings clause of the Fifth Amendment is made applicable to the states through the Fourteenth Amendment." *Wild Rice River Estates, Inc. v. City of Fargo*, 2005 ND 193, ¶ 12, 705 N.W.2d 850. Article I, § 16, of the North Dakota Constitution states that "[p]rivate property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner." "Whether there has been a taking of private property for public use is a question of law." *Wilkinson I*, 2017 ND 231, ¶ 22. The trial court's findings of fact will not be set aside unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *Wild Rice River*, at ¶ 10.

[¶20] The State has conceded that the plaintiffs own the minerals in dispute after our decision in *Wilkinson II*, which stated that "the Wilkinson property is above the OHWM of the historical Missouri riverbed channel and is not State sovereign lands." 2020 ND 179, ¶ 32. Further, "[m]ineral interests in Williams County, in the oil-producing Bakken formation, have value." *Wilkinson I*, 2017 ND 231, ¶ 24. Thus, if the State effectuated a taking, the plaintiffs are due just compensation.

A

[¶21] Before reviewing the merits of the takings claims, we consider whether the takings claims were mooted by the Legislative Assembly or waived by the plaintiffs.

[¶22] The district court concluded that the takings claims were mooted by the passage of N.D.C.C. ch. 61-33.1 and its application to the plaintiffs' property. However, where the government's actions have already worked a taking, "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective." *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) (quoting *First English*

8

*Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 321 (1987)); *see also Knick v. Township of Scott*, 139 S. Ct. 2162, 2171-72 (2019) (noting that government's post-takings actions cannot nullify property owner's Fifth Amendment right). Accordingly, the Legislative Assembly's passage of N.D.C.C. ch. 61-33.1, effective April 21, 2017, 2017 N.D. Sess. Laws ch. 426, has not mooted the plaintiffs' takings claims, which they alleged began in 2010.

[¶23] The district court also concluded that because this action was initiated as a title dispute, a takings claim cannot prevail. The court relied on cases that concluded the government's commencement of a quiet title action alone cannot be a taking. *See Mackin v. City of Coeur D'Alene*, 551 F. Supp. 2d 1205 (D. Idaho 2008), *aff'd*, 347 F. App'x 293 (9th Cir. 2009); *Doenz v. Sheridan County*, Case No. 98-CV-76-D (D. Wyo. June 25, 1999). However, the plaintiffs do not assert the legal action itself worked a taking on their mineral interests, but rather the State leasing their mineral interests caused the taking. The government's assertion of title and further governmental action can amount to a taking. *See Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 888-89 (Fed. Cir. 1983); *Central Pines Land Co. v. United States*, 107 Fed. Cl. 310, 325, 327-28 (Fed. Cl. 2010); *Pettro v. United States*, 47 Fed. Cl. 136, 147-49 (Fed. Cl. 2000). In their amended complaint, the plaintiffs brought claims for declaratory relief declaring that they own the minerals *and* the takings claims for just compensation. Reframing the action as merely an action for quiet title does not preclude a determination of the takings claims on the merits.

[¶24] Finally, the State argues the plaintiffs waived their takings claims by not responding to its waiver argument during summary judgment, which was prior to *Wilkinson II*. In *Wilkinson II*, we concluded that the district court did not dispose of all of the claims, and specifically, the takings claims. 2020 ND 179, ¶ 16. Therefore, the plaintiffs have not waived their takings claims. Because the takings claims have not been mooted or waived, we turn to the merits of the claims.

9

B

[¶25] There are two categories of regulatory action considered per se takings: physical takings and total regulatory takings. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005); *Wild Rice River*, 2005 ND 193, ¶ 13. A physical taking is where the government "requires an owner to suffer a permanent physical invasion of her property." *Lingle*, at 538; *Wild Rice River*, at ¶ 13. "[T]otal regulatory takings" occur when regulations "completely deprive an owner of '*all* economically beneficial use' of her property." *Lingle*, at 538 (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1026 (1992)); *Wild Rice River*, at ¶ 13. For total regulatory takings, the "complete elimination of a property's value is the determinative factor . . . because the total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Wild Rice River*, at ¶ 13. Beyond these two categories, takings challenges are governed by the standards set out in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), which require situation-specific factual inquiries. *Wild Rice River*, at ¶ 13. The plaintiffs contend the district court erred by concluding the State did not commit either a physical taking or a total regulatory taking. They do not assert a taking has occurred under the *Penn Central* factors.

1

[¶26] Although the plaintiffs contend a physical taking occurred, they do not argue they suffered a permanent physical invasion of their property, *Lingle*, 544 U.S. at 538; *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982). Instead, they argue the State committed a temporary physical taking of their minerals by entering into leases with oil operators, thereby directly appropriating their minerals for a period of ten years. *See Lingle*, at 539 (recognizing the "classic taking" involves government directly appropriating private property or ousting the owner from her domain); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074, 2077 (2021) (explaining that "a physical appropriation is a taking whether it is permanent or temporary" and defining "appropriation" as "taking as one's own").

10

[¶27] The district court found that the State did not advertise or otherwise promote minerals for leasing. Instead, operators interested in leasing state-owned minerals filed a nomination petition with the State. If the tract was not already being leased, it was placed on a public auction list. The court found that because the minerals were leased at a public auction, interested parties could avail themselves of any uncertainty in title. The court found, "Rather than entering a lease with a specific legal description, the State's riverbed leases are simply for a given number of acres within a quarter section, with no particular legal description specified beyond 'Missouri River.'"

[¶28] The Section 12 and 13 leases, paragraph 2, provide:

> If [Land Board] owns an interest less than the whole and undivided fee in the leased premises, the royalties . . . shall be paid [Land Board] in the proportion which [Land Board]'s interest bears to the whole and undivided fee. [Land Board] neither warrants nor agrees to defend title to the leased premises, except that all bonuses and rentals will be returned to the [oil operator] in the event [Land Board] does not have a lawful right to lease the leased premises for oil and/or gas exploration and production.

Addendums to the leases reiterate that the Land Board "does not warrant its title to the acreage leased" and that under Board Rule 85-06-06-02.1, "Sovereign lands lease acreage . . . may be adjusted . . . as survey information is obtained, the ordinary high watermark is delineated, and other reliable relevant facts are identified." Moreover, the addendums state, "If, during any time prior to expiration of the lease, it is determined by a court or by [Land Board] that the [Land Board] owns less acreage than that set forth in this lease, then [Land Board] will refund to [oil operator] the proportionate per acre bonus paid for this lease." These provisions make clear that the Land Board was leasing all mineral interests it had in the identified quarter sections, if any, but did not warrant title to the acreage leased.

[¶29] After the acreage adjustments under N.D.C.C. ch. 61-33.1, the State is leasing 159 mineral acres in the Lippert Well spacing unit. The court found that at the time of trial, the State was still owed royalty payments for its interest in the Lippert Well spacing unit. Thus, the State has not received any

11

excess royalty payments, and has not needed to refund any payments to Statoil, as the Lippert Well spacing unit operator. Statoil has since paid the State lump-sum "catch-up" royalty payments.

[¶30] Notwithstanding the State's leases in 2010 and 2011, the plaintiffs (or their predecessors in interest) have entered into numerous oil and gas leases with operators concerning their property located in Sections 12 and 13 since they conveyed the surface to the United States in 1958. In 2009, the plaintiffs entered into leases providing them a $300 per acre bonus payment on 286 acres and a 3/16ths royalty rate. The leases provide they shall remain in effect as long as oil or gas is produced or drilling operations are continuously prosecuted, but that drilling or production on pooled portions of the lease will not maintain the lease for the unpooled portions. Thus, the plaintiffs' leases remain in effect for Section 12, but have expired as to Section 13. The plaintiffs did not refund the bonus payments they received on the expired Section 13 portion of the leases. Although the plaintiffs' royalties were initially placed in suspense due to the title dispute, their outstanding royalties were paid in November 2020. The department of trust lands' director of revenue compliance and managing auditor, Adam Otteson, testified that the State did not retain any funds provided in the Section 12 leases concerning the plaintiffs' property. He also testified the State did not have access or control over the escrowed funds.

[¶31] We conclude the State did not cause a physical taking of the plaintiffs' minerals. While the State's leases included legal descriptions of property that was ultimately determined to be the plaintiffs' property, the State did not warrant title to the property. In fact, the language of the leases reads similarly to a quitclaim deed, which "conveys only the grantor's interest or title, if any, in property, rather than the property itself." *Carkuff v. Balmer*, 2011 ND 60, ¶ 10, 795 N.W.2d 303. By themselves, the leases neither invaded the property nor legally authorized a physical invasion or occupation of the plaintiffs' property. *See also Sickler v. Pope*, 326 N.W.2d 86, 93 (N.D. 1982) (noting that oil and gas leases alone, while evidence of possession, do not constitute actual possession of property); *Cedar Point Nursery*, 141 S. Ct. at 2071 (explaining that physical takings include condemning property, physically taking

12

possession of property without acquiring title, and occupying property); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 n.17 (2002) ("When the government condemns or physically appropriates the property, the fact of a taking is typically obvious and undisputed.").

[¶32] The plaintiffs cite non-binding case law for the proposition that the government commits a temporary physical taking by issuing mineral leases, including *Central Pines*, 107 Fed. Cl. at 327; *Pettro*, 47 Fed. Cl. at 147; *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 65 (2009), aff'd, 862 F.3d 1370 (Fed. Cir. 2017).

[¶33] In *Central Pines*, the court concluded there was a temporary taking of the plaintiffs' mineral interests when the government asserted title to their minerals and issued leases. 107 Fed. Cl. at 325, 328. The court reasoned that oil operators forwent entering into leases with the plaintiffs to enter into leases with only the government. *Id.* at 328. It concluded that "the government's leasing of plaintiffs' mineral interests deprived the plaintiffs of the benefit they otherwise would have received from a potential lessee during that period." *Id.*

[¶34] The plaintiff in *Pettro* owned a sand and gravel pit. 47 Fed. Cl. at 138. After a title search, the Forest Service asserted they owned the property and ordered the plaintiff and his contractors to cease all work in the pit and remove all their equipment, or be liable for damages. *Id.* at 145. The court found the Forest Service's actions had a direct effect on the plaintiff and his contractors, including removing equipment, abstaining from mining, and causing the plaintiff to make "no attempt to exercise his mineral rights." *Id.* at 147. The court concluded a taking had occurred, preventing the plaintiff from exercising his property right to mine the pit and sell the sand and gravel, and depriving him of all economic use of the property. *Id.* at 147, 149.

[¶35] In *Petro-Hunt*, the plaintiff brought temporary takings claims "predicated upon a series of mineral leases entered into between the United States and third parties." 90 Fed. Cl. at 64. The United States Court of Federal Claims dismissed some of the plaintiff's temporary takings claims as untimely because the statute of limitations had run on the claims. *Id.* at 67. Thus, the

court's focus was on when these claims accrued and whether they were timely. *See id.* at 65-67. As a part of this analysis, the court determined that the "decisional law suggests that the timing of the accrual of a temporary takings claim may depend upon the nature of the takings involved"—i.e., whether the takings were physical or regulatory. *Id.* at 65. Without further discussion, the court agreed with the plaintiff that the "leases authorized the physical occupation of property" and thus "should be analyzed as potentially giving rise to physical, not regulatory takings." *Id.*

[¶36] These three cases provide little guidance in the situation presented here. In *Central Pines*, the court found the government's actions deprived the plaintiffs of additional leases. In *Pettro*, the plaintiff was completely prevented from exercising his mineral rights. *Petro-Hunt* was a statute of limitations case, recognizing the leases should be analyzed as "potentially giving rise to physical, not regulatory takings." In concluding that certain claims were not time-barred, the court concluded only that they "state a valid claim" sufficient to survive a motion to dismiss, because it was not clear as a factual matter whether the leases at issue affected the true owner's use or enjoyment of the property. *Petro-Hunt*, 90 Fed. Cl. at 70-71. To the extent *Petro-Hunt* suggested the government's oil and gas leases could effectuate a physical taking on the plaintiff's property, it relied on alleged facts that "the lessees were paying royalties to the United States (and not plaintiff) for the exclusive right (presumably, as against plaintiff) to . . . all of the oil and gas." *Id.* at 70. In contrast, the State's leases at issue here expressly did not warrant title to the property and did not purport to grant an exclusive right, and both the plaintiffs and the State leased the disputed property and were paid royalties.

[¶37] Additionally, the plaintiffs fail to demonstrate the State's leases interfered with any of their property rights. Recall, the plaintiffs entered into leases on their property in 2009. Because the Lippert Well continues to produce, the plaintiffs' leases concerning Section 12 remain active. Unlike in *Central Pines*, *Pettro*, and *Petro-Hunt*, the State's overinclusive leasing activity of disputed interests did not cause the plaintiffs to lose other leases or interfere with the lessee's operations. Therefore, the intervening events of the State

14

entering into leases with oil operators in 2010 and 2011 did not interfere with the plaintiffs' negotiations concerning bonus payments and royalty rates.

[¶38] The plaintiffs also cite *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015), in support of their physical takings claims. In *Horne*, the United States Supreme Court held that the Takings Clause is implicated when the government directly appropriates private property for its own use. 576 U.S. at 357. The Supreme Court further held that a requirement that a percentage of a raisin grower's crop must be physically set aside for the account of the government, free of charge, was a physical taking. *Id.* at 361. In concluding a physical taking occurred, the Court highlighted the government's actual possession and control of the raisins:

> The reserve requirement imposed by the Raisin Committee is a clear physical taking. Actual raisins are transferred from the growers to the Government. Title to the raisins passes to the Raisin Committee. The Committee's raisins must be physically segregated from free-tonnage raisins. . . .
>
> Raisin growers subject to the reserve requirement thus lose the entire bundle of property rights in the appropriated raisins— the rights to possess, use and dispose of them . . . . The Government's actual taking of possession and control of the reserve raisins gives rise to a taking as clearly as if the Government held full title and ownership, as it essentially does.

*Id.* (cleaned up). Because *Horne* emphasized the government's actual, physical possession and control of the property, we view the holding and reasoning as support for our conclusion that no physical taking occurred in this case.

[¶39] Recently, in *Northwest Landowners*, we concluded the State committed a per se taking by allowing third-party oil and gas operators to "physically invade a landowner's property by injecting substances into the landowner's pore space." 2022 ND 150, ¶ 26. Specifically, the bill at issue granted operators the right to access the landowner's property to store or dispose of gases and wastes. *Id.* "As amended, the statutes would allow anyone conducting operations under Chapter 38-08 to inject waste into a surface owner's pore space without the surface owner's consent." *Id.* The bill went beyond codifying

15

the implied easement authorizing "the mineral owner to use the surface estate as 'reasonably necessary' to find and develop minerals when the surface and mineral estates are severed." *Id.* at ¶ 28. The bill authorized "subsurface disposal of waste generated within a spacing unit or unitized field and also disposal of waste generated outside the unit or field." *Id.* at ¶ 29. Because disposal operations beyond the scope of the implied easement are trespasses, the bill's barring of tort actions for these trespasses created an uncompensated physical taking of the surface owner's property. *Id.* at ¶ 30.

[¶40] In *Northwest Landowners*, the State, acting in its sovereign capacity, reallocated property rights through legislation, eliminating the core of a longstanding property right in pore space—the right to exclude others. Here, the State acted in its proprietary capacity by issuing leases. The State's leases did not warrant the State's title to the leased property, nor did they diminish the interest of any other property owner. Through the leases, the State acted in its capacity as a landowner to release any claims it may have to the mineral interests. By entering into the lease agreements, the State did not purport to alter the rights or obligations of others who may have claims or interests in the property.

[¶41] The plaintiffs also cite a line of cases concluding a physical taking occurs when the government physically diverts water or causes water to be diverted away from property owners. *See Dugan v. Rank*, 372 U.S. 609 (1963); *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950); *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931); *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276 (Fed. Cir. 2008). In all of these cases, the government took the property owners' water for public use, depriving them of their water rights and actual use of the water. Contrastingly, in addition to this case involving minerals, not water, the State did not physically invade or seize the plaintiffs' minerals, or otherwise deprive them of leasing their minerals.

[¶42] At no point in time has the State prevented or hindered the plaintiffs' ability to exercise the primary incident of mineral ownership, issuing oil and gas leases, which they have done throughout the years. The plaintiffs have

received bonus payments and, upon resolution of this title dispute, the royalties owed to them.

[¶43] The State may protect its interests in a title dispute and must do "something more" than assert title to complete a taking. *Central Pines,* 107 Fed.Cl. at 325. The State may not abdicate its legitimate claims to sovereign lands. *State ex rel. Sprynczynatyk v. Mills*, 523 N.W.2d 537, 540 (N.D. 1994). To protect the public interest in sovereign lands, the State may have to litigate a quiet title action to determine the extent of its sovereign lands along navigable waters when the boundaries are disputed. *See id.* The State's leases were not without basis—they were consistent with the 2010 Phase I study of the ordinary high water mark (OHWM). The later Phase II study and the Chapter 61-33.1 process applied historical information to determine the OHWM prior to closing the Garrison Dam, which resulted in the State narrowing its sovereign lands claims. The State's leases were not frivolous or unsupported. They were ultimately determined to be overinclusive, but this nonfrivolous assertion of title by the State is not by itself a taking. The State's act of leasing the disputed lands is insufficient to be the "something more" under any of the cases cited to us. The scope of the State's Missouri River acreage would have been disputed and in need of resolution with or without a State lease. Under N.D.C.C. § 47-16-39.1, a title dispute is sufficient for the operator to suspend royalty payments. *Vic Christensen Mineral Tr. v. Enerplus Res. (USA) Corp.*, 2022 ND 8, ¶ 12, 969 N.W.2d 175.

[¶44] Finally, the State's more aggressive litigation positions, which we rejected in *Wilkinson II*, related to application of Chapter 61-33.1, which was enacted in 2017 and amended in 2019. The temporary taking claim here was argued to have begun in 2010 when production began and continued through 2020 when escrowed royalties were paid. Any aggressive litigation positions taken by the State under Chapter 61-33.1 were far too late to support a temporary taking beginning in 2010.

2

[¶45] Alternatively, the plaintiffs contend the State committed a total regulatory taking because it completely deprived them of all economically

beneficial uses of their property. As discussed above, the record shows that the plaintiffs were not deprived by the State's leasing of minerals in any material way, let alone completely deprived of all economically beneficial uses of their property. *Lingle*, 544 U.S. at 538; *Wild Rice River*, 2005 ND 193, ¶ 13. The plaintiffs do not assert they received below market rates in leasing the minerals. As noted above, it was not the lease but the underlying title dispute that triggered the suspension and escrowing of royalties. The plaintiffs do not argue that the State is obligated to pay just compensation every time royalties are subject to suspension or escrow under applicable statutes or rules. Accordingly, we conclude the State has not committed a regulatory taking.

3

[¶46] The plaintiffs argue the State effectuated a taking of their royalties while the royalties were held in escrow at the Bank of North Dakota because the Bank was acting as the agent for the Land Board.

[¶47] Otteson testified that the escrow agreement was between the Bank, as the escrow agent, and Statoil. The escrow agreement in the record states it is between the State, acting through the Bank, and the State, acting through the Land Board. The "Receipt of Escrow Funds" states that Statoil deposited funds into the Bank under the terms of the deposit agreement, which the receipt states was executed by Statoil. The receipt also refers to the Bank as an agent for the Land Board, which Otteson acknowledged in his testimony. Jodi Smith, the Land Board commissioner, testified that any operator can enter into an agreement with the Bank to escrow funds if a title dispute arises. Smith testified the agreement is not with the Land Board, but acknowledged the Land Board has a separate agreement with the Bank to have the Bank act as its agent.

[¶48] The district court found that Statoil, not the State, deposited the royalty payments into an escrow account at the Bank, and was required to do so under Land Board Rule 85-06-06-08.1, which provided that any payor that "proposes to withhold royalty payments based upon an ownership dispute must establish an escrow deposit account and must deposit the disputed payments into this account." Upon resolution of the title dispute, the escrowed funds were

18

remitted to Statoil for dispersal as the well operator. Statoil paid the plaintiffs the royalties owed to them. The court concluded, on the basis of Otteson's written declaration, that the State never had access to or control over the escrowed funds. This is one permissible view of the evidence, which we will not overturn on appeal. *See Serv. Oil*, 2015 ND 77, ¶ 13 ("A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous."). Because the plaintiffs have not demonstrated the State committed a taking in violation of the federal or state constitutions, the court did not err in dismissing the takings claims.

## VI

[¶49] The plaintiffs contend the State was unjustly enriched by leasing their minerals in Section 13 and retaining the Section 13 bonus payments from the oil operators. The plaintiffs assert that equity demands the State disgorge these payments to them.

[¶50] The doctrine of unjust enrichment is well-established:

> Unjust enrichment is an equitable doctrine based upon a quasi or constructive contract implied by law to prevent a person from being unjustly enriched at the expense of another. The doctrine serves as a basis for requiring restitution of benefits conferred in the absence of an expressed or implied in fact contract. A determination of unjust enrichment is a conclusion of law and is fully reviewable by this Court. Unjust enrichment requires: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification for the enrichment and impoverishment; and (5) an absence of remedy provided by law. The doctrine of unjust enrichment may be invoked when a person has and retains money or benefits which in justice and equity belong to another. A determination of unjust enrichment holds that a certain state of facts is contrary to equity. An essential element of recovery under unjust enrichment is the receipt of a benefit by the defendant from the plaintiff that would be inequitable to retain without paying for its value. Even when a person has received a benefit from another, that person is liable only if the circumstances of the receipt or retention are such that, as between the two persons, it is unjust to retain the benefit.

19

*Ritter*, 2004 ND 117, ¶ 26 (cleaned up).

[¶51] Similar to the Section 12 leases, the State did not advertise the leasing of the Section 13 minerals. Instead, the tracts were nominated and placed for auction. The Section 13 leases also state that the Land Board "does not warrant its title to the acreage leased." No well was drilled or oil produced in Section 13, and the Section 13 leases expired under their terms due to non-production. The district court found that it is standard industry practice for the bonus payments on expired leases to be retained by the lessor and not refunded to the oil operator. The plaintiffs also leased their minerals in Section 13 in exchange for bonus payments. The plaintiffs, likewise, did not refund their bonus payments after the Section 13 portions expired for lack of production.

[¶52] The plaintiffs have not shown they were impoverished by the State's retention of the bonus payments. Nor have they shown the State's leases negatively impacted their ability to negotiate their own leases with oil operators. In fact, the plaintiffs (or their predecessors in interest) entered into oil and gas leases for their Section 13 minerals in 2009, before the State entered into its Section 13 leases in 2010 and 2011. The bonus payments that the plaintiffs request be disgorged from the State were provided by the oil operators in exchange for contractual obligations on behalf of the State. The plaintiffs were not parties to the Section 13 leases and did not provide any bonus payments to the State. Thus, the Section 13 leases between the State and oil operators were of no material detriment to the plaintiffs, and equity in our view does not demand disgorgement of the State's bonus payments to the plaintiffs. The district court did not err in dismissing the plaintiffs' unjust enrichment claim against the State.

VII

[¶53] The plaintiffs argue they are entitled to costs and attorney's fees under 42 U.S.C. §§ 1983, 1988, and N.D.C.C. ch. 32-15. Section 1983 provides a cause of action against a state actor depriving a citizen of a constitutional right. Section 1988(b) allows a court, in its discretion, to award attorney's fees to the prevailing party in a 1983 action. Section 32-15-32, N.D.C.C., allows a court, in its discretion, to award costs and attorney's fees to the defendant in an

eminent domain action. *See also* N.D.C.C. § 32-15-01(1) (defining eminent domain as the right to take private property for public use). Because the plaintiffs have not prevailed on their takings claims, the State has not deprived them of their constitutional rights under 42 U.S.C. § 1983, and they are not entitled to costs and attorney's fees under 42 U.S.C. § 1988 or N.D.C.C. § 32-15-32.

## VIII

[¶54] The judgment is affirmed.

[¶55] Jon J. Jensen, C.J.
Lisa Fair McEvers
Jerod E. Tufte

[¶56] The Honorable Gerald W. VandeWalle disqualified himself subsequent to oral argument and did not participate in this decision.

**Crothers, Justice, specially concurring.**

[¶57] I agree with the majority's result and most of what they have written. I write separately regarding the taking claim.

[¶58] The dividing line between governmental actions that constitute taking or not taking private property was explained by the federal court of claims:

> As the court has previously ruled, the government's mere assertion of title does not constitute a taking. As the court explained, "When the Government is acting as a landowner, it is entitled to avail itself of the judicial system in order to clarify or protect its right to title of property in which it owns a stake." In order to establish a taking, something more than the mere assertion of title is required.

*Central Pines Land Co. v. U.S.,* 107 Fed.Cl. 310, 325 (2010) (cleaned up).

[¶59] The majority concludes the State did not commit acts constituting "something more" because during its leasing of the disputed minerals it made known "the Land Board was leasing all mineral interests it had in the identified quarter sections, if any, but did not warrant title to the acreage leased," and "did not warrant title to the property." Majority opinion, ¶¶ 28, 31, respectively. On this point, I take the contrary view.

[¶60] First, I do not agree the fact that the State and the oil companies had contracts permitting a dynamic expansion or contraction of the minerals under lease excuses the State from takings liability to the true owners for leasing more minerals than the State owns. To conclude otherwise would allow the government to indiscriminately claim ownership or control over private property as long as a lease or an administrative regulation permitted the over-leasing activity. Second, in some circumstances the State's act of signing leases when it did not know and would not (or could not) defend its title to minerals could be the "something more" required to support a temporary takings claim.

[¶61] As discussed in a different context, it is the government's action, rather than their description or intent, that determines a liability for taking:

> In whatever other context it may be useful, moreover, determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis. The purpose and function of the Amendment being to secure citizens against governmental expropriation, and to guarantee just compensation for the property taken, what counts is not what government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor. What counts is what the government did. *Hughes v. Washington,* 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (Stewart, J., concurring) (1967). What the government appears to have done here was to prevent Yuba from mining minerals for about six years.

*Yuba Goldfields, Inc. v. U.S.,* 723 F.2d 884, 889-90 (1983).

[¶62] I generally agree with the court in *Central Pines* when it stated the government can "avail itself of the judicial system in order to clarify or protect

its right to title of property in which it owns a stake." 107 Fed.Cl. at 325. In this case the State disputed title to the minerals, leased the disputed minerals (resulting in royalty payments being suspended and held without interest under N.D.C.C. § 47-16-39.1(1)), and engaged in extensive litigation. The litigation position by the State generally, and by the State Engineer in particular, included actions that were much more than the assertion or protection of title. Rather, as we explained in *Wilkinson II*, the State Engineer advanced arguments that were clearly contrary to controlling legislation. We held, "The State Engineer's interpretation would dismantle the statutory process and instead would require each mineral interest claimant to sue and prove the property is subject to inundation by the Pick-Sloan Missouri basin project dams, and not the Missouri River. Clearly, that was not the legislature's intent." *Wilkinson v. Board of University & School Lands,* 2020 ND 179, ¶ 34, 947 N.W.2d 910 (*Wilkinson II*); *Sorum v. State*, 2020 ND 175, ¶ 40, 947 N.W.2d 382. Nevertheless, over-aggressive litigation tactics occurring seven or eight years after the title dispute arose does not support a finding of temporary taking in this case. *See* majority opinion, ¶ 44.

[¶63] The Fifth Amendment does not prevent the government from taking private property; rather, the government cannot take property without payment of just compensation. The court in *Central Pines* explained:

> The Fifth Amendment specifies that private property shall not be taken by the government without "just compensation." U.S. Const. amend. V. Thus, when the government is found to have taken property, just compensation must be paid as damages. In the context of a temporary taking, the proper measure of just compensation is generally recognized to be the rental value of the property (sometimes simply referred to as "fair rental value") over the period of time for which it was taken. *Yuba Natural Res., Inc. v. United States* ("*Yuba III*"), 904 F.2d 1577, 1581 (Fed.Cir.1990); *see also Pettro v. United States,* 47 Fed.Cl. 136, 138 (2000) (compensation for temporary taking is measured by fair market rental value of the property, but not lost profits); *Heydt v. United States,* 38 Fed.Cl. 286, 309 (1997) (proper measure of just compensation for a temporary taking is the fair market rental value of the property). Fair rental value is "the price a willing

23

lessee would pay to a willing lessor, for the period of the temporary taking." *Heydt*, 38 Fed.Cl. at 309.

107 Fed.Cl. at 328.

[¶64] In this case, the plaintiffs leased their property, received bonus payments for those leases, and ultimately received royalties held in suspense during pendency of this 10-year dispute with the State. *See* majority opinion, ¶¶ 29-30. The State signed leases and received bonus payments under nearly the same terms as the plaintiffs. Therefore, under the measure of damages described in *Central Pines,* the plaintiffs have no recoverable damages for these items. The plaintiffs leased their minerals in 2010. It was not until after 10 years of litigation, and the 2020 rejection of the State's claims in *Wilkinson II*, that the plaintiffs finally received their royalty payments that were suspended under N.D.C.C. § 47-16-39.1(1).

[¶65] The 10-year delay in the plaintiffs receiving their royalty payments was directly due to the State's claims and conduct. Without the State's claims and conduct, the plaintiffs would have received their royalty payments starting in 2010. A State's interference with or control over receipt and disposition of money generally, and interest in particular, can be a taking. *See Phillips v. Washington Legal Foundation,* 524 U.S. 156, 169-170 (1998) (involving dispute over control of interest on lawyer trust accounts and whether diversion from owner constituted taking); *Hodel v. Irving,* 481 U.S. 704, 715 (1987) (noting "the right to pass on" property "is itself a valuable right").

[¶66] In this case, the State originally was faced with unresolved title questions about lands under and adjacent to the historic Missouri River. The State was entitled to pursue its title claims to that disputed property, just as the plaintiffs were entitled to pursue their interests in the property. These competing title claims have led to this litigation, which again both parties are entitled to pursue absent "something more."

[¶67] The plaintiffs argue "something more" exists in this case and included a near 10-year suspension of their royalties. However, suspension of the royalties was lawful under N.D.C.C. § 47-16-39.1(1) due to the title dispute, which of

24

course was the subject of this protracted litigation. In turn, the litigation was a proper means for the parties to resolve their competing title claims, so that lawful suspension of royalties by itself should not be viewed as the additional State action necessary to turn a title dispute into a taking.

[¶68] The plaintiffs further contend the State did "something more" when it leased portions of the disputed property that already had been leased by the plaintiffs. I agree with the majority, "the plaintiffs fail to demonstrate the State's leases interfered with any of their property rights." Majority opinion, ¶ 37. As a result, and under the facts of this case, "[a]t no point in time has the State prevented or hindered the plaintiffs' ability to exercise the primary incident of mineral ownership, issuing oil and gas leases, which they have done throughout the years." *Id*. at ¶ 42.

[¶69] Finally, the State leased the disputed property consistent with the 2010 Phase I study of the Ordinary High Water Mark (OHWM). The OHWM changed under the later Phase II study and under enactment of Chapter 61-33.1, N.D.C.C., and the State modified its title claim accordingly. While the State's leasing and initial claim of title can be viewed in retrospect as over-inclusive, under the process used to establish the currently-recognized OHWM, I agree with the majority that the required "something more" does not exist, and that no temporary taking of the plaintiffs' property occurred.

[¶70] Daniel J. Crothers